AO 91
Rev. 11/97

ORIGINAL

# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>TIGRAN BABAKHANYAN,<br>GREGORY ALEXANIAN, and<br>PETER YACOOB | DOCKET NO. 01-1914M<br>MAGISTRATE'S CASE NO. |

FILED
CLERK US DISTRICT COURT
AUG 29 2001
CENTRAL DISTRICT OF CALIFORNIA
DEPUTY

Complaint for violation of Title 18, United States Code, Section 1029(b)(2)

| NAME OF MAGISTRATE JUDGE | | LOCATION |
|---|---|---|
| PAUL GAME, JR. | UNITED STATES MAGISTRATE JUDGE | Los Angeles, CA |

| DATE OF OFFENSE | PLACE OF OFFENSE | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|
| June 2001 - July 2001 | Los Angeles County | |

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

Between June 12, 2001 and July 17, 2001, in Los Angeles County, within the Central District of California, defendants TIGRAN BABAKHANYAN, GREGORY ALEXANIAN and PETER YACOOB conspired and agreed to commit an offense under Title 18, United States Code, Section 1029(a)(3), namely, in transaction affecting interstate commerce, knowingly and with intent to defraud, to possess 15 access devices which are counterfeit or unauthorized access devices.

ENTER ON ICMS
SEP - 6 2001

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:
(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| | |
|---|---|
| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>WESLEY SCHWARK<br>OFFICIAL TITLE<br>Special Agent - United States Secret Service |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1) | DATE |
|---|---|
| | August 29, 2001 |

1) See Federal Rules of Criminal Procedure rules 3 and 54.

BMH:smc REC: Detention (Warrants for all defts.)

A F F I D A V I T

I, Wesley Schwark, being duly sworn, hereby declare and say:

1. I am a Special Agent (SA) with the United States Secret Service (USSS) assigned to the Los Angeles Field Office, and have been so employed since March 1999. Among my duties is the investigation of financial fraud, including the theft and use of federally insured bank account information. I have received formal training from the USSS specifically directed towards credit cards and identification documents and in the identification of altered or counterfeit access devices.

2. This affidavit is made in support of an application for a criminal complaint and the issuance of arrest warrants authorizing the arrests of TIGRAN BABAKHANYAN ("BABKHANYAN"), GREGORY ALEXANIAN ("ALEXANIAN"), PETER YACOOB ("YACOOB") for violation of Title 18, United States Code, 1029(b)(2) (Conspiracy to Commit Access Device Fraud).

3. On June 8, 2001, Bank of America, Vice President - Corporate Security Peggy Thompson contacted me. She told me that over the past several months, Bank of America had fallen victim to a rash of bank customer profiles being sold to persons outside the bank. According to Thompson, a bank customer profile contains the account holder's name, birth date, social security number, address, phone number, birthplace, mother's maiden name,

driver's license number, employer, occupation and bank account number. Thompson told me that the information that makes up the profiles was being used by unauthorized individuals to access the bank accounts.

4. On June 9, 2001, a confidential informant (CI-1) related that he had knowledge of individuals who possessed bank profiles and who were willing to sell them. The informant said that one of the individuals who was selling the bank profiles was BABAKHANYAN.

5. On June 12, 2001, CI-1 met with BABAKHANYAN and an unknown individual at Starbuck's coffee shop, 469 Burchett Street, Glendale, California. Other agents and myself observed the meeting. According to CI-1, the following events occurred:

a. BABAKHANYAN told CI-1 that he had in his possession one Bank of America account profile that he wanted to sell. BABAKHANYAN said he wanted $1,500 for the account profile. BABAKHANYAN showed the bank profile to CI-1 and allowed CI-1 to confirm the balance of the account via phone.

b. CI-1 telephoned me and provided bank profile number 1115000920. I then contacted Peggy Thompson at Bank of America who confirmed the profile number was assigned to customer Cynthia Rodriguez and her bank account was in good standing and had a balance of approximately $800.00. I then telephoned CI-1

and told him/her to refrain from purchasing the profile due to the low balance of the bank account. CI-1 told BABAKHANYAN to call him when he had profiles with sufficient balances to sell.

6. On June 18, 2001, CI-1 said he/she was contacted by BABAKHANYAN who said that he had two (2) other Bank of America account profiles to sell. They agreed to meet at Farmer Boy Restaurant, 726 South Alameda, Los Angeles, California. Other agents and myself observed the meeting. According to CI-1, the following events occurred:

a. When CI-1 arrived, BABAKHANYAN introduced CI-1 to "Greg." Greg was a white male sitting in a white 3 series BMW, California license plate #4MOY363, which was later determined to be registered to ALEXANIAN. BABAKHANYAN and CI-1 proceeded to a patio area of the restaurant. They discussed the account profiles. CI-1 was allowed to check the balances of the bank accounts by phone. CI-1 telephoned me and provided profile numbers 05644-60062 and 10092-08138 which he/she said had been given to him/her by BABAKHANYAN.

b. I then telephoned Peggy Thompson of Bank of America and provided to her the two profile numbers. Thompson told me 05644-60062 was for the bank account of Rapheal Goodman and number 10092-08138 was for the account of Kinter H. Vanhorn. Thompson told me the two accounts were current and that both

accounts had balances of over $60,000. I then told CI-1 to purchase the two profiles for $1,000 each.

c. CI-1 purchased the two profiles with $2,000.00 that I had given him/her prior to the meeting. After the meeting, CI-1 handed the two profiles to me.

7. On June 21, 2001, CI-1 told me that he/she contacted BABAKHANYAN by telephone. CI-1 said that BABAKHANYAN told him/her that he had ten (10) additional bank profiles ready to sell and that he wanted $1,500 for each of the profiles. CI-1 said that BABAKHANYAN told him/her that some of the profiles were from Bank of America accounts and some were from Washington Mutual accounts.

8. On June 27, 2001, I met with a second confidential informant (CI-2) who claimed that he would be willing to assist in the investigation of BABAKHANYAN.

9. On June 28, 2001, CI-1 and CI-2 met with BABAKHANYAN at Starbuck's coffee shop, 469 Burchett Street, Glendale, California. Other agents and myself observed the meeting. According to both CI-1 and CI-2, they discussed purchasing additional account profiles. CI-1 and CI-2 said that BABAKHANYAN told them he had eleven (11) Washington Mutual profiles and four (4) Bank of America profiles to sell.

10. On July 2, 2001, CI-2 made a consensually

monitored/recorded telephone call to BABAKHANYAN to arrange a meeting at Farmer Boy Restaurant, 726 South Alameda, Los Angeles, California. CI-2 was given $6,000.00 for the purchase of profiles, wired with a micro-recorder and driven to Farmer Boy by SA Sonyia Rouel who was acting in an undercover capacity. Other agents and myself observed the meeting. According to CI-2 and SA Rouel, the following events occurred:

a. CI-2 met with BABAKHANYAN who handed him/her eighteen (18) bank profiles. CI-2 was allowed to call me via cellular phone during the meeting to check the account balances on the profile numbers that were provided to him/her by BABAKHANYAN.

b. I contacted Investigators Peggy Thompson of Bank of America and Sandy Fujikawa of Washington Mutual, and provided to them the profile numbers that were given to me by CI-2.

c. I was told by Thompson and Fujikawa the current balances of the accounts corresponding to the account numbers provided by BABAKHANYAN were as follows:

<u>Bank of America Profile Accounts</u>

| | |
|---|---|
| 24421-32899 | $100,000.00 |
| 21696-05997 | $134,000.00 |
| 02132-16274 | $ 90,067.00 |
| 09108-05580 | $105,000.00 |

Washington Mutual Profile Accounts

| | |
|---|---|
| 0198-0000854877-4 | $ 39,199.00 |
| 0177-0001444119-8 | $143,000.00 |
| 0842-0001300238-8 | $158,000.00 |
| 0826-0001000102-2 | $ 46,000.00 |
| 0179-0000880571-0 | $ 84,000.00 |
| 0195-0000891478-1 | $191,000.00 |
| 0195-0000891480-6 | $206,000.00 |
| 0179-0001323596-0 | $ 20,000.00 |
| 0199-0000858163-1 | $ 27,000.00 |
| 0195-0000894480-3 | $100,000.00 |
| 0179-0001323485-5 | $207,000.00 |
| 0871-0000045687-8 | $ 31,000.00 |
| 0876-0000812515-2 | $110,000.00 |
| 0877-0000820969-9 | $ 49,000.00 |

d. There was a combined total balance of approximately $1.7 million in these accounts. I instructed CI-2 to purchase four (4) Washington Mutual account profiles and two (2) Bank of America account profiles. CI-2 paid $1,000 for each of the six (6) account profiles for a total of $6,000.00 and then gave the profiles to me after the meeting concluded.

e. CI-2 told me that BABAKHANYAN also gave him/her a white envelope and was instructed by BABAKHANYAN to give the

envelope to "Jack" (LNU). CI-2 gave the envelope to me and I found one Chase Manhattan credit card convenience check inside the envelope. I contacted Ed Catlett, Investigator for Chase Manhattan, who confirmed the check was for a valid credit card account. Catlett advised the account had one attempted access on June 30, 2001, by phone. Consultation of the relevant cell phone records and subscriber information revealed the number captured by Chase Manhattan was the cellular phone number of BABAKHANYAN. Access to the credit card account had been denied because the proper access number had not been used. The check itself was drawn on the account of Jaqueli R. Royer, 14320 Ventura Boulevard, #177, Sherman Oaks, California.

11. On July 11, 2001, CI-2 made a consensually monitored/recorded call to BABAKHANYAN to discuss the purchase of additional account profiles. CI-2 said that BABAKHANYAN indicated he wanted CI-2 to negotiate a check, similar to the first one intended for "Jack." CI-2 relayed that BABAKHANYAN told him/her that the check had a credit limit of $10,000. A meeting was set up for the next day at Starbuck's coffee shop, 469 Burchett Street, Glendale California.

12. On July 12, 2001, CI-1 and CI-2 met with BABAKHANYAN at Starbuck's coffee shop, 469 Burchett Street, Glendale California. Prior to the meeting, CI-1 wore a micro-recorder body wire.

Other agents and myself observed the meeting. According to CI-1 and CI-2, the following events occurred:

a. BABAKHANYAN expressed his interest in obtaining legitimate social security numbers to enable him to obtain credit in other people's names. They also discussed a mailbox drop owned by a friend of BABAKHANYAN, where BABAKHANYAN claimed to have obtained the Chase Manhattan credit card convenience check he had given CI-2 on July 2, 2001.

b. BABAKHANYAN gave CI-1 two (2) New Cardholder Notification/Agreement Statements from Chase Manhattan. These statements included names, addresses, and account numbers of these two Chase Manhattan customers. They are the statements that are attached to newly issued credit cards. The actual credit cards had been removed from these statements, however. One of the statements related to the convenience check drawn on the account of Jaqueli R. Royer that BABAKHANYAN had given to CI-2 on July 2, 2001. The second statement was for an account with a $10,000 credit limit in the name of Orland Koechler, 14320 Ventura Boulevard, #177, Sherman Oaks, California, which I noticed was the same address that was listed for the account of Jaqueli R. Royer. Investigator Catlett told me that the Koechler account had been flagged for possible fraudulent activity.

13. On July 17, 2001, CI-2 made a consensually

monitored/recorded phone call to BABAKHANYAN. CI-2 stated that he wanted to meet and was interested in purchasing more profiles. CI-2 said that BABAKHANYAN replied that the profiles would not be ready until after 7:00 p.m., but agreed to meet at 3:30 p.m. to talk.

14. Later that same day, CI-2 and undercover agent SA Rouel met with BABAKHANYAN at Starbuck's coffee shop, 469 Burchett Street, Glendale California. Prior to the meeting, CI-2 was wired with a micro-recorder and SA Rouel was wired with a transmitter and a digital recorder. Other agents and myself observed the meeting. According to SA Rouel, during this meeting, BABAKHANYAN described how an associate of his had acquired the previously provided profiles from a bank employee and stated that the associate would bring the profiles to him. SA Rouel stated that she would like to continue doing business. BABAKHANYAN said, "that is fine." BABAKHANYAN said to let him know how many more profiles she desired. He additionally indicated that he had five (5) available right away.

15. Following the purchase of the four (4) Washington Mutual accounts from BABAKHANYAN on July 2, 2001, Sandy Fujikawa of Washington Mutual Bank, informed me that she had been able to link the origin of the four accounts back to one Washington Mutual employee, PETER YACOOB.

16. On July 20, 2001, I went to Washington Mutual Corporate Building in Chatsworth, California, and conducted an interview of YACOOB. I advised YACOOB of his Miranda rights. He signed a wavier stating that he had been advised of these rights and agreed to speak to me regarding this matter without an attorney present. During the interview YACOOB related the following and provided a signed written statement:

a. YACOOB stated that some time around June 18, 2001, a friend of his from high school named Greg ALEXANIAN had approached him. ALEXANIAN is the same person who drove BABAKHANYAN to Farmer Boy on June 18, 2001. YACOOB related that ALEXANIAN offered him money for account profiles of bank customers.

b. YACOOB stated that he had met with ALEXANIAN on two separate occasions to give him Washington Mutual account profiles. The first time they met was somewhere near Ventura Boulevard and Tampa Avenue at a gas station. The second time they met, ALEXANIAN came to YACOOB's secondary employer, Unique Sounds.

c. YACOOB stated that he was paid $400 around July 3, 2001, as proceeds of the sale of the first account profiles. YACOOB stated that he had yet to be paid for the second set of accounts he provided ALEXANIAN.

17. On July 24, 2001, YACOOB placed a consensually monitored/recorded phone call to ALEXANIAN. During the phone call, ALEXANIAN stated that the last profiles had not been sold yet and he had no money for YACOOB. ALEXANIAN added that he would call when he had the money.

18. Since July 17, 2001, no further purchases of bank profiles have been made from BABAKHANYAN, yet according to CI-2, BABAKHANYAN continues to call him/her offering to sell more profiles.

19. Based upon my training and experience and on the foregoing facts, it is my opinion that there appears to be probable cause to believe that TIGRAN BABAKHANYAN, GREGORY ALEXANIAN, and PETER YACOOB violated Title 18, United States Code, Section 1029(B)(2) (Conspiracy to Commit Access Device Fraud).

Wesley M. Schwark
Special Agent
United States Secret Service

Subscribed and sworn to before me on this 29th day of August, 2001.

United States Magistrate Judge